UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY ALLEN NICHOLS,

        Plaintiff,

v.

UNKNOWN PARTY #1, *et al.*,

        Defendants.

_____/

Case No. 1:16-cv-1392

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a prisoner in the custody of the Michigan Department of Corrections (MDOC). This matter is now before the Court on defendant Dr. Carrel's motion for summary judgment based on plaintiff's failure to exhaust his administrative remedies (ECF No. 10), Dr. Carrel's second motion for summary judgment on the merits (ECF No. 18), and plaintiff's motion to amend the complaint to add Nurse Amber Pinkston (ECF No. 29).[1]

**I.**    **Background**

Plaintiff's complaint involves medical treatment provided to him at the Carson City Correctional Facility ("DRF") by David Carrel, D.O., and two unknown nurses referred to as "Jane Doe's". Plaintiff sets forth the following allegations. On April 3, 2015, plaintiff was "feeling really bad." Compl. (ECF No. 1, PageID.3). He was examined by a nurse (RN) who told plaintiff he was suffering from the flu. When plaintiff tried to explain that he had something more serious, the nurse stated that "prisoners always think they are suffering from something more serious than

---

[1] Dr. Carrel is listed on the docket sheet as "Daniel Carrell."

1

they have." *Id*. Plaintiff went back to his housing unit where he stated he had chills, was feverish, and sweating profusely. *Id*.

On April 4, 2015, plaintiff stated that he was getting worse, his throat was almost closed, and he had a high temperature. *Id*. A nurse examined plaintiff and stated that he was suffering from the flu, gave him some Tylenol, and said the doctor did not have time to see prisoners with the flu. *Id*.

On April 5, 2015 plaintiff stated that he was "gasping for air" with his throat "three times its normal size." *Id*. He was barely able to get out of bed. *Id*. Corrections Officer Kalnins called Health Care and after a "brief argument" with the RN, plaintiff was told to go to Health Care. *Id*. Plaintiff passed out in the hallway. *Id*. He awoke on a gurney and told the nurse he was dying. *Id*. The nurse called Dr. Carrel, who told the nurse that plaintiff was suffering from the flu and sent him back to his unit. *Id*. at PageID.4.

On April 6, 2015, plaintiff was "in and out of consciousness." *Id*. He was taken to Health Care in a wheelchair. The Nurse Practitioner, Victoria Merren, looked at plaintiff's vitals and ordered that he be sent to the local hospital emergency room. *Id*. Later, he was air-lifted to the University of Michigan Hospital, where he was diagnosed with necrotizing fasciitis, a condition which plaintiff identified as "a flesh eating bacteria." *Id*. Plaintiff stated that he had six surgeries to remove the bacteria. *Id*. He was hospitalized for two months, and "had to undergo physical therapy to learn how to walk, talk and eat again." *Id*.

Plaintiff alleged that defendants were deliberately indifferent to his serious medical needs, with the gravamen of his claim as follows:

> It was obvious to the RN(s) who initially examined me that I was seriously ill and in need of urgent medical care. But instead of the RN(s) taking my apparent need of medical treatment serious, they simply diagnosed me with having the flu. Even Dr. Carrell should have know[n] that I was seriously ill and need medical

attention.  That I was not just suffering from the flu when my condition continued to deteriorate.  Losing consciousness is not a normal flu symptom.

*Id*.  Plaintiff seeks compensatory and punitive damages.  *Id*.at PageID.5.

## II. Defendant's motions for summary judgment

### A. Legal standard

Dr. Carrel has filed two motions for summary judgment.  The first motion is based on lack of exhaustion, while the second motion is based on the merits of plaintiff's claims.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

3

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the Court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.     Failure to Exhaust

#### 1.     Exhaustion requirement

The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies.  *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001).  A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741.  One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court.  This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.  *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"  *Jones*, 549 U.S. at 218.

### 2. MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3. Discussion

Defendant has identified one grievance related to plaintiff's claim which was exhausted through Step III, DRF 16-05-1083-28E ("1083). *See* Step III Grievance Report (ECF No. 10-1, PageID.51); Grievance No. 1083 (ECF No. 10-1, PageID.52-61). In his grievance, plaintiff stated that the incident occurred on January 28, 2016, and dated his grievance May 1, 2016.[2] *See* Grievance 1083, PageID.55. Plaintiff's grievance gave a rather detailed account of his

---

[2] The Court notes that plaintiff uses a confusing method of dating, e.g., he refers to May 1, 2016 as "1.5.16".

claims: on April 3, 2015 an RN told plaintiff that he was suffering from the flu; on April 4th his symptoms grew worse, he lost consciousness, and Dr. Carrel instructed a nurse "to send me back to my housing unit without further treatment;" later that night Nurse Pinkston was "very standoffish and neglectful to my dire conditions as the signs were clearly visible" and that when Pinkston heard plaintiff making "the gargaling [sic] sound" she had "a seemingly careless look in her eye, that I was [making] that sound happen;" on or about April 6th, plaintiff was wheeled to health care semi-conscious, at which time NP Merren ordered his transfer to a hospital.  Grievance 1083 at PageID.55-56.  Plaintiff later stated that his interaction with Nurse Pinkston and Dr. Carrel occurred on April 5th.  *Id.* at PageID.59.  Plaintiff attached an affidavit to the grievance in which he stated that "while at Duane Waters recovering, I made an attempt to grieve what had happened to me by asking the medical staff there for a grievance form as I was unable to get it myself" and that "[w]hen I was able to sit down for a long enough period of time to write, I did."  *Id*. at PageID.58.  Plaintiff's grievance did not include any information as to when he was hospitalized off-site, when he was at Duane Waters, or when he returned to DRF.

The grievance was received on May 10, 2016 and rejected as untimely.  Grievance 1083, Step I at PageID.55.  Neither plaintiff's Step II nor Step III appeals addressed the fact that his grievance was untimely.

In his response to the motion for summary judgment, plaintiff alleged that he was incapacitated for a long time and that he demonstrated "good cause" for filing an untimely grievance under MDOC Policy Directive 03.02.130, which provides in pertinent part:

> Prisoners and parolees are required to file grievances in a responsible manner.  A grievance shall be rejected by the Grievance Coordinator if it contains profanity, threats of physical harm, or language which demeans the character, race, ethnicity, physical appearance, gender, religion, or national origin of any person, unless it is part of the description of the grieved behavior and is essential to that description.  A grievance also may be rejected for any of the following reasons:  .

6

>. . 3. The grievance is filed in an untimely manner. The grievance shall not be rejected if there is a valid reason for the delay; e.g., transfer.

Policy Directive 03.02.130 ¶ G.3.

In support of his motion, Dr. Carrel has filed copies of plaintiff's medical records, which contain an entirely different timeline of events than set forth in the grievance or alleged in the complaint.  These records reflect that plaintiff was discharged from the University of Michigan hospital on May 7, 2015 with a diagnosis of necrotizing fasciitis.  Medical Records (ECF No. 20-1, PageID.180).  Plaintiff was then sent to Duane Waters Hospital, where he remained until June 16, 2015.  *Id*. at PageID.187.  Plaintiff did not receive any discharge instructions from Duane Waters Hospital which would have prevented him from filing a grievance after June 16, 2015.  *See* Discharge Orders (ECF No. 20-1, pageID.189).  In the Court's opinion, plaintiff's hospitalizations would be a valid reason for failing to file a grievance.  However, plaintiff provided no explanation for his failure to file a grievance until 11 months after his discharge.  In addition, plaintiff provides no explanation for why he used January 28, 2016 as the incident date for the alleged deliberate indifference or why he waited until May 5, 2016 to submit a grievance.

Based on this record, plaintiff failed to properly exhaust a grievance against Dr. Carrel.  *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93.  Accordingly, Dr. Carrel should be granted summary judgment for lack of proper exhaustion.

### C.    Eighth Amendment claim

In addition, Dr. Carrel is entitled to summary judgment on the merits of plaintiff's Eighth Amendment claim.  Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004).  To state a § 1983 claim, a plaintiff must allege

two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id*. at 835. "It is obduracy

and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

As an initial matter, Dr. Carrel points out that plaintiff's allegations are contradicted by plaintiff's medical records. While this Court must draw all inferences in favor of the non-moving party, it is not required to adopt a non-moving party's version of the facts which is blatantly contradicted by the record and which no reasonable jury could believe. *See Scott*, 550 U.S. at 380. Here, plaintiff's allegations regarding his treatment at DRF are so blatantly contradicted by his own medical records that no reasonable jury could believe them.

Contrary to plaintiff's allegations, the evidence demonstrates that plaintiff did not present with a serious problem at DRF until April 12, 2015 – during a time when plaintiff alleged (in both his grievance and his complaint) he was already undergoing treatment at the University of Michigan hospital. The events which led to plaintiff's hospitalization occurred on April 12th, 13th, 14th and 15th.

On April 2, 2015, plaintiff had a scheduled visit with a nurse to take vital signs for benign hypertension. Medical Records (ECF No. 20-1, PageID.150). On April 3rd, plaintiff had lab specimen collection. *Id*. at PageID.151. On April 6th, NP Merren updated plaintiff's chart stating "Reviewed serial BPs, improved." *Id*. at PageID.152. On April 8th, NP Merren reviewed plaintiff's lab results. *Id*. at PageID.153.

Plaintiff first presented to nursing staff at DRF complaining of respiratory complaints on April 12, 2015. At about 6:51 p.m. on that date, plaintiff stated he had shortness of breath, a sore throat rated at "5", headache and dizziness. Medical Records (ECF No. 20-1, PageID.154). He had a temperature of 99.8 degrees, and stated that he had these symptoms since April 10th. *Id*. at PageID.154-155. His lungs were clear. *Id.* at PageID.154. Plaintiff was assessed

with a common cold, given salt water to gargle, Motrin for a sore throat, and instructions to inform health care of difficulty breathing or increased pain. *Id*. at PageID.155.

On the morning of April 14, 2015, plaintiff stated that he felt hot, sick, too weak to work and needed antibiotics. *Id*. at PageID.156. His temperature was 98.6 degrees. *Id*. The records reflect that plaintiff's throat was not red, no white patches seen, and no runny nose. *Id*. Plaintiff was assessed with an "alteration in comfort r/t cold/flu." *Id*. He was taken off of his work assignment for two days, and told to use Motrin/Tyelenol, to rest, to increase water, and to eat meals. *Id*. at PageID.156-158.

Later on April 14th, RN Slusher saw plaintiff for an unscheduled visit. *Id.* at PageID.159. Plaintiff's temperature had risen to 100.0 degrees, he walked with a slow steady gait, and made a "snoring noise" while breathing in. *Id*. at PageID.162. Plaintiff stated that he had vomited three times, had neck pain, headache, and was unable to eat due to sore throat and nausea. *Id.* at PageID.163. RN Slusher contacted Dr. Carrel, who suspected a viral infection and prescribed plaintiff a liter of normal saline, 30 mg of Toradol (both administered intravenously), and 50 mg of Vistaril for nausea. *Id.* at PageID.159-160; Dr. Carrel Affidavit (ECF No. 18-1, PageID.140).

During the night of April 14th (11:08 p.m.), plaintiff reported respiratory problems, complaining of neck pain and difficulty breathing. Medical Records at PageID.165. Plaintiff reportedly fell on the way to the Health Center, was assisted by a corrections officer, and ultimately placed on a gurney. *Id*. at PageID.165-168. The nurse, RN Pinkston, contacted Physician Assistant Simon who prescribed Rocephin, instructed plaintiff to rest and take small sips of fluid, and scheduled an appointment for the next day. *Id*. at PageID.169.

Health care examined plaintiff at 7:29 a.m. the next morning. *Id*. at PageID.175. The left side of plaintiff's neck was significantly enlarged, he gurgled while breathing, his upper

chest was red, he could not open his mouth all of the way, and the inside of his throat was swollen. *Id.* After examination, NP Merren sent plaintiff to the emergency room (ER). *Id.* at PageID.176-177. A chart update noted that while plaintiff was in the ER they had to intubate, found that he had a large infection in his neck and chest, and transported him by Aero Med to the University of Michigan hospital where the plan was "to trach and open up the infection." *Id.* at PageID.178. Records reflect that plaintiff was in surgery on April 15th, and was taken back to the OR (operating room) for "repeat washout and debridement" on April 17th, 18th, 19th, 21st, and 24th. *Id.* at PageID.180-182. As discussed, plaintiff was discharged from the University of Michigan hospital on May 7, 2015 with a diagnosis of necrotizing fasciitis and sent to Duane Waters Hospital, where he remained until June 16, 2015. *Id.* at PageID.187.

Plaintiff's claims regarding his interaction with Dr. Carrel are blatantly contradicted by his medical records. There is no evidence that on April 5, 2015, while plaintiff was on a gurney, gasping for air, Dr. Carrel told a nurse that plaintiff was suffering from the flu and sent him back to his unit. As discussed, Dr. Carrel's only interaction with plaintiff was on the afternoon of April 14, 2015, when RN Slusher contacted the doctor and reported that plaintiff had flu symptoms which included vomiting. At that time, Dr. Carrel suspected a viral infection and prescribed plaintiff a liter of normal saline, 30 mg of Toradol (both administered intravenously), and 50 mg of Vistaril for nausea. *Id.* at PageID.160; Dr. Carrel Affidavit (ECF No. 18-1, PageID.140). Contrary to plaintiff's complaint, there is no record that he passed out in the hallway or awoke on a gurney when RN Slusher contacted the doctor.

There is no question that plaintiff suffered from a serious medical condition. However, there is no evidence that Dr. Carrel doctor knew of and disregarded an excessive risk to plaintiff's health or safety when he conferred with RN Slusher on April 14th. At that time, Dr.

11

Carrel was aware that plaintiff had vomited and suspected that he was suffering from a viral infection. Dr. Carrel treated that condition. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004), quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). Plaintiff's condition deteriorated rapidly after Dr. Carrel conferred with RN Slusher. Within about 12 hours his symptoms worsened from an apparent viral infection with vomiting to symptoms which required emergency treatment. However, even if Dr. Carrel made an inaccurate diagnosis based on plaintiff's medical record, mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Farmer*, 511 U.S. at 835 Accordingly, Dr. Carrel's motion for summary judgment should be granted on the merits.

### III. Motion to amend

Nearly three months after Dr. Carrel filed his second motion for summary judgment, plaintiff filed a motion to amend his complaint to add a new defendant, RN Amber Pinkston. Fed. R. Civ. P. 15(a)(2) provides that a party may amend its pleading only with the court's leave and that "[t]he court should freely give leave when justice so requires." Justice does not require the Court to allow plaintiff to amend his complaint. As an initial matter, plaintiff's motion is untimely. Plaintiff filed his motion to amend on October 30, 2017, more than three months after the July 10, 2017 deadline for filing pre-trial motions. *See* Case Management Order (CMO) (ECF No. 8). Plaintiff did not submit a proposed amended complaint with his motion. *See Roskam Baking Co. v. Lanham Machinery Co.*, 288 F.3d 895, 906 (6th Cir. 2002) ("[I]mplicit in

this statement is that the district court must be able to determine whether 'justice so requires,' and in order to do this, the court must have before it the substance of the proposed amendment.").

However, on September 20, 2017 (about two months after the deadline), plaintiff submitted a proposed amended complaint as an exhibit to his response to the motion for summary judgment. In his proposed amended complaint, discarded the allegations made in the original complaint and Grievance 1083, in favor of a recitation of facts consistent with the medical records attached to Dr. Carrel's motion for summary judgment. *See* Proposed Amended Complaint (ECF No. 25). The crux of plaintiff's new deliberate indifference claim is that "Nichols' condition was ignored by both Carrell [sic] and Pinkston" and as a result "the bacteria had spread into Nichol's [sic] chestbone" and he "nearly died." *Id*. at PageID.223. Besides being untimely, the claims in plaintiff's proposed amended complaint are not supported by the rejected Grievance 1083, which set forth a different timeline and recited facts which were not consistent with the medical record.

Furthermore, "leave to amend may be denied when the amendment would be futile." *Khaled v. Dearborn Heights Police Department*, -- Fed. Appx. --, 2017 WL 4411024 at *4 (6th Cir. Oct. 4, 2017) (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 569 (6th Cir. 2003)). Here, plaintiff's proposed amended complaint is futile, given the facts presented on summary judgment. As discussed, *supra*, there is no factual basis for plaintiff's deliberate indifference claim against Dr. Carrel. Nor does plaintiff have a claim against RN Pinkston, identified in the amended complaint as the nurse "who ignored Plaintiff's worsening medical condition due to her predetermined belief that all inmates lie about being sick to gain attention." Motion to amend at PageID.247. The medical record reflects that RN Pinkston had one interaction with plaintiff at 11:08 p.m. on April 14, 2015. At that time, RN Pinkston was unable to examine plaintiff's throat because plaintiff stuck his tongue out, but noted an enlarged left neck lymph node

and facial grimacing.  Medical Records at PageID.169.  RN Pinkston contacted the on-call medical provider, PA Simon, for orders, and then followed the PA's orders.  *Id*.  Plaintiff's claim against RN Pinkston cannot be construed as deliberate indifference.  The nurse examined plaintiff's condition and contacted the medical provider for orders on how to proceed.  For all of these reasons, plaintiff's motion to amend should be denied.

### IV.    Recommendation

Accordingly, I respectfully recommend that defendant Dr. Carrel's motions for summary judgment (ECF Nos. 10 and 18) be **GRANTED**, that plaintiff's motion to amend (ECF No. 29) be **DENIED**, and that this action be **TERMINATED**.


Dated:  February 27, 2018                                         /s/ RAY KENT
                                                                  United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).